IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| PAMELA L. KIPELA, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CV-03-246 |
| | ) | |
| JO ANNE B. BARNHART, | ) | |
| | ) | |
| Defendant. | ) | |

MEMORANDUM ORDER

CONTI, District Judge

### Introduction

Pending before the court is an appeal from the final decision of the Commissioner of

Social Security ("Commissioner" or "defendant") denying the claim of Pamela L. Kipela

("plaintiff") for disability insurance benefits ("DIB") under Title II of the Social Security Act

("SSA"), 42 U.S.C. § 423, *et. seq.*, and supplemental security income ("SSI") under Title XVI of

the SSA, 42 U.S.C. § 1381, *et. seq.*  Plaintiff contends that the decision of the administrative law

judge (the "ALJ") that she was not disabled from July 28, 1996 through April 23, 1999, and

therefore not entitled to benefits for that period of time, should be reversed.  Plaintiff argues that

the ALJ's decision is not supported by substantial evidence.  She requests that the court issue an

order awarding disability benefits to her for that period of time or, alternatively, that the matter

be remanded to the Social Security Administration for a new hearing.  Defendant asserts that the

decision of the ALJ should be affirmed on the ground that it is supported by substantial evidence.

The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal

Rules of Civil Procedure.  Because the ALJ's decision is supported by substantial evidence, the court will grant defendant's motion for summary judgment.

### *Procedural History*

Plaintiff filed the applications at issue in this appeal on a protective basis on August 14, 1997, alleging that she had been disabled since July 28, 1996, by reason of bulging discs in her neck, nerve damage, and fibromyalgia.  (R. at 122, 124-26, 604-06).  Her applications were denied by an administrative law judge in a decision issued on April 23, 1999.  (R. at 31-49, 67-70, 73-75, 607-12, 615-19).  Plaintiff filed a complaint in the district court after her request for review was denied by the Appeals Council.  (R. at 83-84, 87-89).  Because the audiotape of her hearing before the administrative law judge was of such poor quality that it could not be transcribed, the district court remanded the case to the Commissioner for further administrative proceedings pursuant to sections 20(g) and 1631(c)(3) of the SSA.  (R. at 96, 104).

While her appeal was pending, plaintiff again applied on April 11, 2000, for disability insurance benefits and supplemental security income benefits, alleging that she had been unable to work since July 31, 1996.  (R. at 12, 57).  Although her claims were denied initially, a hearing was held before an administrative law judge at her request.  (R. at 57, 619A-619J).  The administrative law judge issued a decision on January 25, 2002, finding that plaintiff became disabled on April 24, 1999.  (R. at 12, 54-61).

After the remand from the district court due to the poor quality of the tape, the Appeals Council on November 12, 2003, vacated the final decision of the Commissioner and remanded this case to an administrative law judge, noting that plaintiff had been found to be entitled to benefits on a later application due to a disability with an onset date of April 24, 1999.  (R. at 105-

06).  A new hearing was ordered to determine whether plaintiff could establish the existence of

an onset date prior to April 24, 1999.  The hearing on remand was held before the ALJ on

September 10, 2004, at which plaintiff was represented by counsel and testified.  (R. at 12).  A

medical expert and a vocational expert (the "VE") also testified.  (Id.).  On October 15, 2004, the

ALJ determined that plaintiff was not disabled prior to April 24, 1999.  (R. at 9-21).  Plaintiff's

request for review was denied by the Appeals Council.  Plaintiff then filed this action to obtain

judicial review of the ALJ's decision.

### *Legal Standard*

The Congress of the United States provides for judicial review of the Commissioner's

denial of a claimant's benefits.  42 U.S.C. § 405(g).  This court must determine whether there is

substantial evidence which supports the findings of the Commissioner.  42 U.S.C. § 405(g).

"Substantial evidence is 'more than a mere scintilla.  It means such relevant evidence as a

reasonable mind might accept as adequate.'"  Ventura v. Shalala, 55 F. 3d 900, 901 (3d Cir.

1995)(quoting Richardson v. Perales, 402 U.S. 389 (1971)).  This deferential standard has been

referred to as "less than a preponderance of evidence but more than a scintilla."  Burns v.

Burnhart, 312 F. 3d 113, 118 (3d Cir. 2002).  This standard, however, does not permit the court

to substitute its own conclusions for that of the fact-finder.  Id.; Fargnoli v. Massonari, 247 F.3d

34, 38 (3d Cir. 2001)(reviewing whether the administrative law judge's findings "are supported

by substantial evidence" regardless of whether the court would have differently decided the

factual inquiry).

3

***Plaintiff's Background and Medical Evidence***

The relevant period of time in question is July 28, 1996 through April 23, 1999.  Plaintiff was 43 years old at the beginning of this period and was 46 years old when this period ended. (R. at 22, listing plaintiff's date of birth).  Prior to that period of time, she worked as a waitress, catering waitress and hostess.  (R. at 925).  She was an employee of Frenchy's Restaurant for approximately 15 years.  (R. at 180).

On August 8, 1996, Dr. John Rawa determined that plaintiff was "temporarily disabled" until October 1, 1998.  (R. at 350).  On August 23, 1996, approximately one month after the alleged onset of plaintiff's disability, a cervical scan was done.  (R. at 159).  According to Dr. William R. Downer, plaintiff had a "[d]iffuse disc bulge at C5-6" and a "[s]maller disc bulge at C4-5," neither of which appeared to "significantly impinge upon the ventral surface of the thermal sac."  (R. at 259).

On October 8, 1996, Dr. Mark S. Wilcox reported that plaintiff exhibited findings "consistent with a very mild carpal tunnel syndrome across the right wrist" and findings "approaching those of very mild carpal tunnel syndrome" across the left wrist.  (R. at 214).  Dr. Wilcox reported that there was "no electrical evidence of cervical radiculopathy in either extremity."  (R. at 215).

On February 27, 1997, Dr. John S. Beachler reported that plaintiff potentially had "very mild carpal tunnel syndrome across the right wrist."  (R. at 386).  She received an injection of

Depo-Medrol[1] and was instructed to wear splints.  (Id.).  Dr. Beachler did not recommend

surgery.  (Id.).

Subsequently, on April 21, 1997, Dr. Mark R. Lodico reported that plaintiff's "aches and

pains [had] been interfering with [her] normal life-style," but that she did not wish to be on

medications.  (R. at 200).  It was also noted that a walking regimen was to be included in

plaintiff's exercise program.  (R. at 201).  Dr. Lodico opined that plaintiff had symptoms that

were "consistent with fibromyalgia and possible myofascial pain syndrome."  (R. at 200).  One

week later, Dr. Robert Sutherland found plaintiff to be suffering from the same ailments.  (R. at

195).  Nevertheless, he noted that the range of motion in her cervical spine was "full in all

planes" and that she was able to walk easily about the examination room."  (R. at 192).  On May

20, 1997, plaintiff saw Dr. Sutherland again.  Plaintiff presented him with a walking log which

indicated that she was walking for 35 minutes every day.  (R. at 189).

In September, 1997, plaintiff underwent EMG[2] and nerve conduction studies on all four

extremities.  (R. at 203).  Dr. Wilcox reported that plaintiff was apparently suffering from "carpel

tunnel syndrome across the right wrist."  (R. at 206).  Dr. Cynthia Britton noted that plaintiff was

not suffering disc space narrowing, scoliosis, facet degenerative disease or a congenital

abnormality of the cervical spine.  (R. at 207).  Plaintiff was also seen by Dr. Ghassan Alayli,

who recorded that her neck had "fairly good range of movement."  (R. at 264).

---

[1]Depo-Medrol is defined as "an anti-inflammatory glucocorticoid for intramuscular, intrasynovial, soft tissue or intralesional injection." *Physician's Desk Reference*, 2615 (60th ed. 2006).

[2]An "EMG" is defined as an "electromyogram."  *Taber's Cyclopedic Medical Dictionary*, 690 (20th ed. 2005).

Dr. David R. Kraus saw plaintiff on September 30, 1997.  In a letter to Dr. Alayli dated October 3, 1997, he described plaintiff as "surely loose."  (R. at 216).  He reported that she had been "incapacitated intermittently with neck pain," and that she showed "some mild degenerative changes."  (Id.).  He diagnosed plaintiff as having fibromyalgia.[3]  (Id.).  Plaintiff underwent a bone scan, which turned out to be normal.  (R. at 220).

On October 22, 1997, plaintiff was examined by Dr. Bruce Cotugno, who recorded that her neck was "supple but very sensitive to touch."  (R. at 228).  He also noted that she suffered from "extreme fingerpoint sensitivity."  (Id.).  Plaintiff was diagnosed as having a "cervical sprain, cervical bulging, disc bulging and fibromyalgia."  (Id.).  A few weeks later, on November 10, 1997, Dr. Cotugno checked a box which read as follows: "PERMANENTLY DISABLED-Has a physical or mental condition which permanently precludes any gainful employment.  The patient is a candidate for Social Security Disability or SSI."  (R. at 224)(emphasis in original).

On January 9, 1998, plaintiff was seen by Dr. Joseph Morelli.  (R. at 272).  He believed that her prognosis was "good."  (R. at 274).  Plaintiff was diagnosed as having fibromyalgia.  (R.

---

[3]In Sarchet v. Chater, 78 F.3d 305 (7th Cir. 1996), the United States Court of Appeals for the Seventh Circuit commented on fibromyalgia:

> Its cause or causes are unknown, there is no cure and, of greatest importance to disability law, its symptoms are entirely subjective.  There are no laboratory tests for the presence or severity of fibromyalgia.  The principal symptoms are "pain all over," fatigue, disturbed sleep, stiffness, and–the only symptom that discriminates between it and other diseases of a rheumatic character–multiple tender spots, more precisely 18 fixed locations on the body (and the rule of thumb is that the patient must have at least 11 of them to be diagnosed as having fibromyalgia) that when pressed firmly cause the patient to flinch.  All these symptoms are easy to fake, although few applicants for disability benefits may yet be aware of the specific locations that if palpated will cause the patient who really has fibromyalgia to flinch.

Id. at 306-07.

6

at 272).  Dr. Morelli, however, reported that plaintiff suffered from no exertional impairments.

(R. at 15, 275-76).

On February 18, 1998, Dr. V. Rama Kumar, a state agency physician, determined that

plaintiff could occasionally lift 100 pounds or more, frequently lift 50 pounds or more, and stand,

sit or walk for as many as six hours per day.  (R. at 278).  He also determined that her pushing

and pulling abilities were "unlimited" in both her upper and lower extremities.  (Id.).  No

postural, manipulative, visual, communicative or environmental limitations were found. (R. at

277-84).

During the final year of the period in question, plaintiff was treated by Dr. Robert

Multari.  (R. at 337).  In July 1998, a lumbar spine MRI was done.  (R. at 321).  The report

indicated that "no focal lumbar disc herniation [was] present" and that "no underlying spinal

stenosis [was] evident on [the] exam."  (R. at 321).  Dr. Multari referred plaintiff to Dr. Elaine

Greifenstein for an evaluation to determine whether she was suffering from lupus.  (R. at 318).

Dr. Greifenstein reported that plaintiff sat comfortably in the examination room, but that she had

"tenderness at 14 out of 18 fibromyalgia tender points."  (R. at 307-08).  Plaintiff's range of

motion in her cervical spine was "preserved," and she had "full range" of motion in her elbows,

wrists and hands.  (R. at 308).  Dr. Greifenstein's diagnosis was that plaintiff was suffering from

fibromyalgia.  (R. at 309).  Plaintiff's "suspicion for systemic lupus" was deemed to be low.  (R.

at 308).

Plaintiff does not base her claim for benefits on any kind of mental impairment.

Nevertheless, it is worthy of note that she was evaluated by Dr. Michael Mercatoris (Ph.D.), who

concluded that she suffered from "chronic pain disorder."  (R. at 269).  Her records were

reviewed by Dr. Roger Glover (Ph.D.), who noted that any potential mental impairments were not severe.  (R. at 285).  She was also evaluated by Dr. Ian Slayter, a psychiatrist, who recommended that plaintiff pursue physical therapy, relaxation training and regular exercise.  (R. at 336).

At the hearing, Dr. Garrett Dixon testified as a medical expert at the request of the ALJ. (R. at 931).  He identified plaintiff's medically determinable impairments as chronic pain syndrome (often referred to as fibromyalgia), mild cervical and lumbar disc disease, carpel tunnel syndrome, anxiety and depression.  (R. at 932).  Dr. Dixon testified after reviewing plaintiff's medical records and listening to her testimony, and he opined that she had no impairment which met or equaled any of the listings in 20 C.F.R. pt. 404, subpt. P, app. 1.  (R. at 931-32).  He further testified that, during the period of time in question, plaintiff was capable of performing work at the sedentary or light levels.  (R. at 932-33).  In so stating, Dr. Dixon explained that plaintiff needed to avoid both repetitive use of the arms and "sustained neck postures." (R. at 932).  Plaintiff's attorney mentioned Dr. Greifenstein's determination that there were 14 out of 18 fibromyalgia tender points found throughout plaintiff's body in December, 1998.  (R. at 933). When asked whether those findings indicated that plaintiff was suffering from a disabling condition, Dr. Dixon testified that the tender points were "simply the criteria used to diagnose fibromyalgia" and did not, in and of themselves, indicate the presence of a disabling impairment. (R. at 933-34).

Testimony was also taken from the VE.  (R. at 942-46).  The ALJ asked the VE to assume that a hypothetical person with plaintiff's educational and vocational background was "capable of performing work at the sedentary exertional level with a sit-stand option, avoiding

sustained or repetitive activity involving the arms and also avoiding static postures as described by Dr. Dixon," and to consider whether such a person could perform work existing in significant numbers in the national economy.  (R. at 944).  The VE testified that such an individual could work as a routing clerk or surveillance system monitor.  (Id.).  The VE's testimony established that these jobs existed "in the national economy" for purposes of 42 U.S.C. § 423(d)(2)(A).  (Id.). In response to a question posed by plaintiff's counsel, the VE testified that an individual who needed to lie down for a cumulative total of two hours each day would not be capable of "sustaining substantial gainful work activity" as it existed in the national economy.  (R. at 945).

### Discussion

Under Title XVI of the SSA, a disability is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. § 1382c(a)(3)(A). Similarly, a person is unable to engage in substantial gainful activity when "his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . . ." 42 U.S.C. § 1382c(a)(3)(B).

In order to make a disability determination under the SSA, a five-step sequential evaluation must be applied.  20 C.F.R. §§ 404.1520, 416.920.  The evaluation consists of the following stages: (1) whether the claimant is currently engaged in substantial gainful activity; (2)

if not, whether the claimant has a severe impairment; (3) if so, whether the claimant's severe

impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P,

app. 1; (4) if not, whether the claimant's impairment prevents him from performing his past

relevant work; and (5) if so, whether the claimant can perform any other work which exists in the

national economy in light of his age, education, work experience and residual functional

capacity.  20 C.F.R. §§ 404.1520, 416.920; Sykes v. Apfel, 228 F.3d 259, 262-63 (3d Cir. 2000).

If the plaintiff fails to meet the burden of proving the requirements in the first four steps, the

administrative law judge may find that the plaintiff is not disabled.  Burns v. Burnhart, 312 F.3d

at 119.  The Commissioner is charged with the burden of proof with respect to the fifth step in

the evaluation process.  Id.

In the instant case, the ALJ found: (1) plaintiff has not engaged in substantial gainful

activity since the alleged onset of disability on July 28, 1996; (2) plaintiff suffered from

fibromyalgia and a bulging disc in the cervical spine, which are considered "severe" for purposes

of 20 C.F.R. §§ 404.1520(c), 416.920(c); (3) these impairments do not meet or medically equal

any of the listed impairments in 20 C.F.R. pt. 404, subpt. P, app. 1; (4) plaintiff was unable to

perform any of her past relevant work during the period of July 28, 1996 through April 23, 1999;

and (5) there were nevertheless a significant number of jobs in the national economy that she

could have performed.  (R. at 20-21).

Plaintiff argues that (1) the ALJ erroneously failed to credit her testimony at the hearing,

(2) he failed to give adequate weight to the opinions of certain physicians and to explain

adequately his evaluation of the medical evidence, and (3) he erroneously found that she was not

disabled prior to April 24, 1999, even though she had already been found to be disabled

subsequent to that date.  Defendant disputes each of these arguments and argues that the ALJ's decision is supported by substantial evidence.  The court will proceed to address each argument in turn.

### a.  The ALJ's Evaluation of Plaintiff's Testimony

Plaintiff contends that the ALJ failed to explain adequately why her testimony was not found to be fully credible.  The court finds that the ALJ did adequately explain why plaintiff's testimony was not given unqualified acceptance.  Although plaintiff testified that she needed to take periodic naps throughout the day, perhaps because of her medication, the ALJ found that her medical records made no reference to that side effect.  (R. at 17).  Plaintiff alleged that she was unable to sit comfortably for a lengthy period of time, but the ALJ noted that she had reported walking for 35-50 minutes each day.  (Id.).  Plaintiff insisted in her testimony that she had been unable to lift more than a quart of milk during the period of time in question, but the ALJ cited medical records which indicated that she had purchased half-gallon quantities of milk.  (Id.).  The ALJ did find plaintiff's allegations of pain to be credible, albeit not to the extent that, considering the record as a whole, those allegations could "support a conclusion that the claimant's level of pain was so severe as to preclude all work activity, even at a sedentary level."  (Id.).

It is true that the VE testified, in response to a question posed by plaintiff's counsel, that an individual who needed to lie down for up to two hours each day would be unable to engage in substantial gainful activity.  (R. at 945-46).  Nevertheless, the ALJ determined that plaintiff's contention that she needed such an accommodation was not supported by substantial evidence. (R. at 20).  The ALJ was not obligated to credit every limitation alleged by plaintiff.  Rutherford v. Barnhart, 399 F.3d 546, 554-56 (3d Cir. 2005).  If an administrative law judge's hypothetical

question does not adequately convey all of the claimant's credibly established limitations, the vocational expert's testimony cannot constitute substantial evidence that the claimant is capable of performing work existing in significant numbers in the national economy. <u>Ramirez v. Barnhart</u>, 372 F.3d 546, 552-56 (3d Cir. 2004). In the instant case, however, the ALJ concluded that the limitation included in the question posed by plaintiff's counsel was not credibly established. For this reason, the ALJ did not err in failing to account for it when he determined plaintiff's residual functional capacity.

The court likewise finds that the ALJ's determination that plaintiff "retained the capacity for work that exists in significant numbers in the national economy" is supported by substantial evidence. (R. at 20). The ALJ relied upon the testimony of the VE, who testified that a hypothetical person with plaintiff's background and the limitations found by the ALJ to be credible would be able to work as either a "surveillance system monitor or routing clerk." (<u>Id</u>.). The VE "further testified that these representative occupations accounted for about 220,000 jobs in the national economy and more than 1300 jobs in the local Pennsylvania economy." (<u>Id</u>.). Dr. Garrett Dixon, a medical expert, testified that plaintiff "would have been capable of performing work at the sedentary exertional level with a sit/stand option." (R. at 18). Dr. Morelli found that plaintiff suffered from no disabling impairments. (R. at 275-76). Accordingly, the ALJ's determination that plaintiff retained the ability to work at the sedentary exertional level during the period of time in question is supported by substantial evidence. Based upon a review of the record, it is clear that the evidence relied upon by the ALJ amounts to "more than a mere scintilla." <u>Burns</u>, 312 F. 3d at 118. Given the mandate from Congress that "[t]he findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be

12

conclusive," the court concludes that the ALJ's decision should be affirmed.  42 U.S.C. § 405(g).

### b.  The ALJ's Evaluation of the Medical Evidence

To the extent that plaintiff argues that the ALJ inadequately evaluated the medical evidence in this case, the court finds that argument unpersuasive.  The record in this case consists of almost 1,000 pages and includes medical records for periods after April 23, 1999.  In Fargnoli v. Massanari, 247 F.3d 34 (3d Cir. 2001), the United States Court of Appeals for the Third Circuit explained that an administrative law judge is not required "to make reference to every treatment note" in a case where, as here, the claimant has "voluminous medical records."  Id. at 42.  The ALJ in the instant case satisfied his obligation to explain the rationale for his decision. Not only did he explain why he credited some portions of the record while rejecting others, but he did so by referring to specific decisions governing the issues in question.  (R. at 17-18).  For instance, he relied upon Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993), in order to explain why he chose not to adopt Dr. Cotugno's conclusion that plaintiff was permanently disabled during the applicable period of time.  In Mason, the court of appeals stated that "[f]orm reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best."  Mason, 994 F.2d at 1065.  Under these circumstances, it is clear to the court that the ALJ fulfilled his duty in the instant case.

In arguing that the ALJ failed to analyze properly the relevant medical evidence, plaintiff also calls the court's attention to medical reports prepared by Dr. Cotugno, Dr. Greifenstein and Dr. Multari, all of whom examined plaintiff during the period in question.  Dr. Cotugno examined plaintiff on October 22, 1997, finding her to be suffering from a "cervical sprain,

13

cervical bulging, disc bulging and fibromyalgia." (R. at 228). He noted that her neck was "very sensitive and tender to touch," and that she had exhibited "extreme fingerpoint sensitivity." (Id.). He examined her again on November 10, 1997. On that occasion, he checked the employability box which read as follows: "PERMANENTLY DISABLED-Has a physical or mental condition which permanently precludes any gainful employment. The patient is a candidate for Social Security Disability or SSI." (R. at 224)(emphasis in original). On December 1, 1998, Dr. Greifenstein examined plaintiff, noting that "fibromyalgia has significantly impaired her ability to work." (R. at 309). Dr. Multari examined plaintiff on multiple occasions in 1998, noting that she suffered from fibromyalgia. (R. at 320).

Defendant contends that the ALJ's decision is based upon substantial evidence. Specifically, defendant relies upon the records and testimony of physicians which support the finding that plaintiff retained the ability to work during the period of time in question. For instance, Dr. Morelli, who examined plaintiff twice during the month of January 1998, noted that plaintiff's prognosis was good. (R. at 274). A physician from Preferred Primary Care Physicians, Inc., determined that there was inadequate "backup to commit [plaintiff] to disability." (R. at 229). Dr. Lodico and Dr. Sutherland noted that plaintiff walked normally and that her spine was "normal with no deformities." (R. at 199). Dr. Kraus found plaintiff's motion to be only 25% restricted. (R. at 216). A state agency physician determined that plaintiff was capable of performing a full range of heavy work occasionally or frequently, and that she could stand, sit or walk (with normal breaks) for as long as six hours each day. (R. at 208). Dr. Dixon, a medical expert, testified that plaintiff was capable of performing "light range" work during the period of time in question. (R. at 932). Furthermore, the VE testified that, with the limitations

14

found by the ALJ to be credible and supported by the plaintiff's medical records, a person in plaintiff's situation could perform entry-level or unskilled work at the sedentary level.  (R. at 944).

Plaintiff asserts that her disability is not disproven by sporadic or transitory activity, and that the ALJ failed to give adequate weight to the opinions of her treating physicians.  Defendant rebuts plaintiff's contentions by discounting many of the records relied upon by plaintiff.  For instance, defendant relies on Mason v. Shalala, 994 F. 2d 1058, 1065 (3d Cir. 1993), and Newhouse v. Heckler, 753 F. 2d 283, 286 (3d Cir. 1985), for the proposition that conclusory medical opinions, especially those expressed by a physician's simple act of checking a box or filling in a blank, may be accorded minimal weight by the administrative law judge.  Defendant also emphasizes the language of 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2), which state that "controlling weight" is given to "a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairments" only where that opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record."

The standards governing the weight to be given to the medical opinions of treating sources have been clearly established.  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  61 Fed. Reg. 34490, 34491 (1996).  An administrative law judge must accord great weight to the reports of treating physicians, "especially when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time."  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000).  "When a conflict in the

evidence exists, the ALJ may choose whom to credit but cannot reject evidence for no reason or

for the wrong reason." Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999).  If an administrative

law judge determines that a treating physician's opinion is outweighed by conflicting medical

evidence, he may reject that opinion.  Newhouse v. Heckler, 753 F.2d 283, 286 (3d Cir. 1985).

The United States Court of Appeals for the Third Circuit declared in Adorno v. Shalala, 40 F.3d

43 (3d Cir. 1994), that "a statement by a plaintiff's treating physician supporting an assertion that

she is 'disabled' or 'unable to work' is not dispositive of the issue." Id. at 47-48.  Since the issue

of a claimant's disability status is expressly reserved to the Commissioner, the source of an

opinion as to whether a particular claimant is statutorily disabled is entitled to no "special

significance." 20 C.F.R. §§ 404.1527(e), 416.927(e).  Whenever the administrative law judge's

decision is not fully favorable to the claimant, the opinion of the administrative law judge "must

contain specific reasons for the weight given to the treating source's medical opinion, supported

by the evidence in the case record, and must be sufficiently specific to make clear to any

subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion

and the reasons for that weight." 61 Fed. Reg. 34490, 34492 (1996).

Dr. Cotugno saw plaintiff only twice prior to rendering his opinion that she was

permanently disabled.  It is clear from Dr. Cotugno's letter of October 22, 1997, that plaintiff had

only recently been referred to him by Dr. Barry Austin.  (R. at 227-28).  The court finds that after

considering the lack of a longitudinal relationship between Dr. Cotugno and plaintiff and by

reason of the ultimate decision as to her disability status being within the purview of defendant,

the ALJ did not commit reversible error when he discounted Dr. Cotugno's designation of

plaintiff as "permanently disabled." 20 C.F.R. §§ 404.1527(d)(2)(i), 416.927(d)(2)(i) (the length

of the treatment relationship is an important factor to be considered when the treating source's opinion is not given controlling weight); Adorno, 40 F.3d at 47-48.

While Dr. Greifenstein and Dr. Multari both diagnosed plaintiff as having fibromyalgia, their records do not reflect the existence of resulting limitations.  (R. at 306-20).  Plaintiff does not argue that she suffered from an impairment listed in 20 C.F.R. pt. 404, subpt. P, app. 1. Accordingly, she cannot demonstrate that she was statutorily disabled solely by showing that she suffered from a *potentially* disabling medical condition.  The ALJ had a duty to consider the combined effect of plaintiff's impairments *and resulting limitations*.  Burnam v. Schweiker, 682 F.2d 456, 457-58 (3d Cir. 1982).  In the instant case, it is clear that the ALJ fulfilled this duty. The record as a whole including the testimony of Dr. Dixon, who reviewed the records containing those diagnoses and found that plaintiff was able to perform sedentary work during the relevant period, supports the ALJ's determination.  (R. at 931-42).

The court finds that the ALJ did not err in the weight afforded the opinions of Dr. Cotugno, Dr. Greifenstein, and Dr. Multari.  The ALJ credited the conclusions of those physicians with respect to the diagnosis of fibromyalgia and found that impairment to be severe, and he gave reasons for crediting or not crediting the opinions of physicians with respect to plaintiff's residual functional capacity.  For example, he referred to Dr. Morelli's determination that plaintiff suffered from no exertional limitations (R. at 15, 275-76) and to the conclusory assessments made by Dr. Cotugno.  (R. at 17, 224).  The ALJ called upon a medical expert to testify at the hearing.  (R. at 18).  He chose to credit Dr. Dixon's testimony, which established that during the period of time at issue, plaintiff "would have been capable of performing work at the sedentary level with a sit/stand option."  (R. at 18).

17

### c.  The Applicability of the "Medical Improvement" Doctrine

Plaintiff concludes her argument by contending that, given the Commissioner's subsequent determination that plaintiff was disabled as of April 24, 1999, the burden is on the Commissioner to come forward with "substantial evidence of medical improvement permitting performance of substantial gainful activity."  This contention is without merit.  Where Congress has seen fit to provide for the application of the "medical improvement" standard in the social security disability context, it has done so.  42 U.S.C. § 423(f)(1)(A).  Pursuant to its rulemaking authority, the Social Security Administration promulgated regulations governing the application of the "medical improvement" standard in *termination* proceedings.  20 C.F.R. §§ 404.1594, 416.994.  This court has no mandate to rewrite those regulations by judicial fiat.  Indeed, federal courts are required to give effect to the Commissioner's reasonable construction of the SSA even if they would differently interpret ambiguous provisions of the Act.  Barnhart v. Thomas, 540 U.S. 20, 26-29 (2003); Barnhart v. Walton, 535 U.S. 212, 223-25 (2002).

To bolster her contention, plaintiff cites Chrupcala v. Heckler, 829 F. 2d 1269 (3d Cir. 1987).  In that case, the United States Court of Appeals for the Third Circuit stated: "Fairness would certainly seem to require an adequate showing of medical improvement whenever an ALJ determines that disability should be limited to a specified period."  Id. at 1274.  Chrupcala involved a challenge to an administrative law judge's finding of *cessation* of disability.  Id. at 1270.  Plaintiff's case is not a termination case, but rather a case in which she attempts to establish the onset of disability *before* the period of time at which the Commissioner concedes that plaintiff became disabled.

18

Chrupcala applied the standard enunciated in Kuzmin v. Schweiker, 714 F.2d 1233 (3d Cir. 1983). In Kuzmin, the court of appeals concluded that "*in a termination proceeding*, once the claimant has introduced evidence that his or her condition remains essentially the same as it was at the time of the earlier determination, the claimant is entitled to the benefit of a presumption that his or her condition remains disabling." Id. at 1237 (emphasis added). In so holding, the court of appeals was careful to make "a distinction between the issue of the existence of a medical condition and the issue of the existence of statutory disability." Id. While defendant does not dispute plaintiff's assertion that her medical conditions predated April 24, 1999, the ALJ concluded that plaintiff was not *statutorily disabled* prior to that date. Since plaintiff is unable to establish that her impairments met or medically equaled an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1, she cannot establish the onset of disability prior to April 24, 1999, solely by showing that she suffered from *potentially disabling* medical conditions prior to that date. Instead, it is incumbent upon her to show that her impairments were disabling *in her case*.

Consequently, the mere fact that plaintiff was found to be "disabled" for the period of time *after* April 24, 1999, does not mean that she was likewise "disabled" *before* that date. It is true that the record includes evidence that her *medical condition* predated April 24, 1999. (R. at 921-30). In fact, the ALJ determined that her condition prevented her from performing "any of her past relevant work." (R. at 21). The Commissioner, however, met her burden at the fifth step of the sequential evaluation process to show that plaintiff could have performed other work existing in "the national economy" during that period of time. Thus, plaintiff was not disabled prior to April 24, 1999.

Instead of arguing that a disability existed after the date of a purported termination, plaintiff alleges that her current disability had an onset date which predated the point in time at which the ALJ found her to be statutorily disabled.  In other words, plaintiff does not appear to contend that the Commissioner must show medical *improvement*.  She apparently contends that it is incumbent upon defendant to show that her condition *had worsened* on April 24, 1999, and that if defendant was not able to make that showing, the ALJ should have concluded that she was disabled *prior* to that date.  This backward application of the "medical improvement" doctrine would have no logical limiting principle, since it would raise a presumption that one who is found to be disabled on a given day was likewise disabled prior to the established onset date. Accordingly, the court holds that the medical improvement doctrine advanced by plaintiff is inapplicable to this case.

### *Conclusion*

Based upon the evidence of record, the parties' arguments, and the supporting documents filed in support and opposition thereto, this court concludes that substantial evidence supports the ALJ's finding that plaintiff was not statutorily disabled from July 28, 1996 through April 23, 1999.  The decision of the ALJ denying plaintiff's application for SSI and DIB for that period of time is affirmed.

Therefore, plaintiff's motion for summary judgment (Docket No. 14) is **DENIED**, and defendant's motion for summary judgment (Docket No. 16) is **GRANTED**.

**IT IS ORDERED AND ADJUDGED** that judgment is entered in favor of defendant, Jo Anne B. Barnhart, Commissioner of Social Security, and against plaintiff, Pamela L. Kipela.

The clerk shall mark this case as closed.

By the Court:


/s/ Joy Flowers Conti
Joy Flowers Conti
United States District Judge

Dated: September 12, 2006


cc:      Counsel of Record

21